# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-20025

————

United States Court of Appeals
Fifth Circuit

**FILED**

November 30, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee Cross-Appellant

v.

MANSOUR SANJAR; CYRUS SAJADI; CHANDRA NUNN, ADAM MAIN;
SHOKOUFEH HAKIMI,

Defendants - Appellants Cross-Appellees

SHAWN MANNEY,

Defendant - Appellant

————

Appeals from the United States District Court
for the Southern District of Texas

————

Before JONES, BARKSDALE, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Defendant Main's petition for panel rehearing is GRANTED IN PART and DENIED IN PART.  Main's petition for rehearing en banc is DENIED.

IT IS ORDERED that our prior panel decision, *United States v. Sanjar*, 853 F.3d 190 (5th Cir. 2017), is WITHDRAWN as to Adam Main, and the following is SUBSTITUTED in its place.  The only changes to the prior opinion are in sections V(B), VII(A), and the conclusion.

No. 15-20025

The reason Willie Sutton once gave for robbing banks is true of Medicare today: that's where the money is. So it is not surprising that we consider another case alleging a scheme to defraud the multibillion dollar government program. A jury convicted the six defendants of that fraud as well as paying and receiving kickbacks for referrals. Their appeal alleges defects throughout the investigation and prosecution of the case, beginning with the search of the medical office, running through the trial, and ending with the financial obligations imposed as part of their sentence. The government also appeals, objecting to the district court's decision to offset the defendants' restitution liability with any amounts recovered through forfeiture.

I.

Drs. Mansour Sanjar and Cyrus Sajadi enrolled Spectrum Psychiatric Services P.A., their recently formed community mental-health center, as a Medicare provider in 2006. For the following six years, Spectrum held itself out as providing partial hospitalization program (PHP) care. During that time, Spectrum billed Medicare over $90 million for PHP services.

PHPs offer intensive treatment to mentally-ill patients, serving as an alternative to traditional hospitalization. To qualify, a patient must be suffering a severe onset of his or her illness; a situation the government's expert describes as a "crisis." Qualifying patients are required to undergo mental-health evaluations within twenty-four hours of admission, see a doctor daily, and receive twenty hours of treatment weekly. Given the intensive nature of PHP care, Medicare reimburses it at a higher rate than alternative treatments.

That financial incentive led Sanjar and Sajadi to submit what the jury found to be fraudulent bills. The evidence, construed in favor of the government as the jury's verdict requires, showed that the bills were fraudulent in two respects. Patients, although they had a history of mental

2

illness, were not suffering from the acute onsets PHP serves. One patient, for example, testified that at the time she was admitted to Spectrum, she was not experiencing a severe episode of her chronic depression or any other mental-health issues. Spectrum's pattern of PHP care was also at odds with the acute onset that the program covers. Such episodes should be random, but Spectrum cycled patients between PHP and the intensive outpatient program (IOP)—a less intensive treatment with lower reimbursement rates—according to set timelines: ninety days in PHP, then four to six weeks in IOP, at which time the cycle would restart.

Apart from whether PHP treatment was medically necessary for the patients, the clinic was not providing that level of care. Patient after patient billed as PHP participants testified to never interacting with doctors for more than ten minutes. Instead, they often spent their time at Spectrum watching movies, playing games, listening to music, and socializing. So recreational and diversionary were the services Spectrum provided that one patient described it as a "Mickey Mouse facility."

Such a scheme, of course, requires patients. This is where three other defendants and the kickbacks come into play. Spectrum's Office Administrator, Shokoufeh Hakimi, oversaw this effort. Hakimi first used Charles Roberts to recruit patients. Roberts, who pleaded guilty and testified at trial, paid group-home operators to send their Medicare-eligible residents to Spectrum. Among those to whom Roberts gave kickbacks were group-home owners Chandra Nunn and Shawn Manney. Roberts paid each $100 per patient every two weeks, which was half of what he earned. Apparently concerned about detection, Nunn required her payments in cash.

Before long, Nunn's greed overcame her initial timidity. She cut Roberts out of the scheme and began dealing directly with Sanjar, Sajadi, and Hakimi. Her referrals alone spawned $28.5 million in PHP claims for Spectrum. Nunn

maintained her steady supply of Medicare beneficiaries by paying residents of her group home to attend Spectrum. She gave payments the way she took them: in cash. A group-home resident testified that Nunn once gave her envelopes full of money, labeled with residents' names, to hand out to other residents attending Spectrum.

The final defendant, Physician Assistant Adam Main, helped cover up the fraud. Sanjar and Sajadi had him falsify and backdate medical charts to make it appear patients were suffering severe onsets of mental illnesses. One patient's file, for example, lists that he was suffering from major depressive disorder, undergoing daily panic attacks, and relapsing on cocaine. But at trial the patient testified that he was not experiencing any such symptoms when he met with Main, had never before been diagnosed with major depressive disorder, and could not afford cocaine.

The doctors similarly instructed Head Social Worker Terry Moore, another Spectrum employee who pleaded guilty and testified, to print and affix new dates to prior mental-health evaluations for repeat patients. Sanjar and Sajadi further signed medical charts even when they did not oversee patient evaluations.

This operation lasted half a decade. Although Medicare paid out nowhere close to the more than $90 million Spectrum sought for PHP reimbursements, it did pay just under $7 million. [1]

Federal agents began to focus on Spectrum after arresting Roberts for his role as a recruiter in a separate health care fraud scheme. Roberts cooperated and the information he provided about Spectrum launched an investigation that resulted in an indictment charging:

---

[1] Unexplained in the record is why Spectrum was paid such a small percentage of what it sought from Medicare for these and other claims.

No. 15-20025

- Sanjar, Sajadi, Hakimi, Main, and Nunn with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One);

- Four counts of health care fraud under 18 U.S.C. § 1347 tied to some of the conspirators (Counts Two-Five)[2];

- Sanjar, Sajadi, Hakimi, Nunn, and Manney with conspiracy to defraud the United States and pay health care kickbacks, in violation of 18 U.S.C. § 371 (Count Six); and

- Five counts of health care kickbacks under 42 U.S.C. § 1320a-7b(b)(1), (b)(2) tied to some of the conspirators (Counts Seven-Eleven)[3].

A jury found defendants guilty of all but the kickback charge in Count Nine that applied to Sanjar and Manney. Based on varying assessments of each defendant's role in the offense, the district court sentenced them to terms of imprisonment ranging from 24 to 148 months. Sanjar, Sajadi, and Main were further ordered to pay restitution and forfeit illegal proceeds.

## II.

Sanjar alleges error in the way the government investigated the case, contending that the warrant authorizing the search of Spectrum does not comply with the constitutional requirement that it "particularly describ[e] the . . . things to be seized." U.S. CONST. amend. IV.

We interpret that language to require enough detail in the warrant to allow a reasonable agent to know what items she is permitted to take. *United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011). The concern is that the magistrate authorizing the warrant, and not the agents executing it, should be deciding which items may be seized. *United States v. Allen*, 625 F.3d 830, 834–35 (5th Cir. 2010) (citing *Marron v. United States*, 275 U.S. 192, 196 (1927)). Generic language may satisfy this "particularity" requirement if describing a

---

[2] Count Two charges Sanjar. Count Three charges Sajadi and Main. Count Four charges Sanjar and Main. Count Five charges Sajadi and Main.

[3] Count Seven charges Hakimi. Count Eight charges Sanjar, Sajadi, and Nunn. Count Nine charges Sanjar and Manney. Count Ten charges Sajadi and Nunn. Count Eleven charges Sanjar and Nunn.

more specific item is not possible. *Williams v. Kunze*, 806 F.2d 594, 598 (5th Cir. 1986).

The warrant must further not be overbroad, meaning "there must be probable cause to seize the particular things named in the warrant." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). This related but distinct concept flows from the probable cause requirement. Together, the two aspects of the Fourth Amendment require that (1) a warrant provide sufficient notice of what the agents may seize and (2) probable cause exist to justify listing those items as potential evidence subject to seizure. *Kunze*, 806 F.2d at 598–99 (treating these as separate questions).

Sanjar's challenge, which mostly objects to the warrant allowing seizure of all patient files, seems to be more about the latter. In terms of the notice the former requires, the warrant authorizes seizure of "documents constituting . . . patient files" as well as those relating to Medicare claims, the PHP program, and Spectrum's finances. That list, even if somewhat generic, provided sufficient notice of what items the agents could take. *Aguirre*, 664 F.3d at 614 (rejecting a particularity challenge even when the items seized were only the "functional equivalent" of those listed in the warrant); *Kunze*, 806 F.2d at 598 (rejecting particularity challenge to a seizure of 50,000 to 60,000 documents, over 90% of which were client files, because the warrant "specifically authorized" the seizure of those documents). The agents did not seize the patient files because of a judgment call they made when executing the warrant; they seized the files because the magistrate had expressly authorized them to do so. *Marron*, 275 U.S. at 196.

The principal question is thus whether the broad authorization to seize all patient files (and other listed categories of documents) was supported by probable cause. The scope of the seizure depends on the scope of the suspected crime. *Kunze*, 806 F.2d at 598 (explaining that a warrant authorizing seizure

No. 15-20025

of all of a company's records would be lawful when "probable cause exists to believe that an entire business was merely a scheme to defraud, or that all records of a business are likely to constitute evidence"). If the evidence presented to the magistrate provided probable cause of fraud limited to a particular patient or group of patients, the resulting warrant authorizing seizure of all of Spectrum's patient files would be problematic.

But the magistrate's authorization to seize all of Spectrum's patient files was supported by evidence of pervasive fraud in the PHP program, which was a major part of the clinic's business. The affidavit summarized information from two former Spectrum employees and two patients revealing that (1) patients ended up in PHP because of fees paid to recruiters and patients, not because of physician referrals, and (2) the time the patients spent at Spectrum was spent watching television, playing bingo, and coloring rather than receiving the PHP treatment being billed to Medicare—billings that exceeded $90 million. The information presented to the magistrate thus provided probable cause to conclude that fraud and kickbacks infected the entire PHP program. That evidence of a wide-ranging conspiracy and scheme justified the seizure of patient files, at a minimum those of PHP patients used in the prosecution. *Kunze,* 806 F.2d at 599 (rejecting argument that authority to seize all client files of tax consultant was overbroad because probable cause supported widespread fraud involving offshore tax shelters and even files relating to onshore transactions that may provide relevant evidence). The district court did not err in declining to suppress the evidence seized pursuant to the warrant.

### III.

Defendants next claim error in how the grand jury indicted the case. We review these claims de novo. *United States v. Jones,* 733 F.3d 574, 584 (5th Cir. 2013); *United States v. Miller*, 520 F.3d 504, 512–13 (5th Cir. 2008).

7

No. 15-20025

A.

Sanjar and Nunn contend the two conspiracies listed in the indictment—the first for defrauding Medicare under the specific health care fraud conspiracy statute (18 U.S.C. §§ 1347, 1349); the second for defrauding the government and violating the Anti-Kickback Statute under the general conspiracy statute (18 U.S.C. § 371)—charge a single crime. Such a problem, which courts label "multiplicity," exists when a defendant is punished twice for the same conduct. *United States v. Ogba*, 526 F.3d 214, 232–33 (5th Cir. 2008). As this doctrine is derived from the Double Jeopardy Clause, it looks to the *Blockburger*[4] test asking "whether each provision requires proof of a fact which the other does not." *Albernaz v. United States*, 450 U.S. 333, 337 (1981). In making that determination, we look not just at the elements of the statutes but also at how the offenses were charged in the indictment and presented at trial. *Ogba*, 526 F.3d at 234.

The centerpiece of the health care fraud conspiracy alleged in Count One was the "submitting [of] false and fraudulent claims to Medicare." That can occur independent of any kickbacks paid for referrals. The purpose of the section 371 conspiracy in Count Six, on the other hand, was the payment and receipt of kickbacks. That can occur without the submission of any fraudulent Medicare claims.[5] Section 371 also requires an overt act, which section 1349 does not. We have before held that indictments charging these conspiracies do not pose a multiplicity problem and the same is true of these allegations.

---

[4] *Blockburger v. United States*, 284 U.S. 299 (1932).

[5] Although Count Six lists not just violation of the Anti-Kickback Statute as an object of the conspiracy, but also section 371's general "defraud[ing] the United States," that portion of the charge focuses not on financial harm to the government but "impairing . . . through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program." It therefore does not overlap with the first conspiracy's focus on financial harm.

No. 15-20025

*Jones,* 733 F.3d at 584; *see also United States v. Njoku,* 737 F.3d 55, 68 (5th Cir. 2013); *United States v. Moran,* 778 F.3d 942, 964 (11th Cir. 2015).

B.

Sanjar also alleges the opposite problem, duplicity, for Counts Six, Eight, and Eleven. Duplicity occurs when a single count alleges multiple offenses. *Miller,* 520 F.3d at 512. A duplicitous indictment is only cause for reversal if the defendant was prejudiced by the duplicity. *Id.* The most common way such a charge harms a defendant is when it allows a nonunanimous verdict with all jurors finding the defendant guilty but not necessarily of the same offense. *Id.* at 512–13.

The duplicity challenge to Count Six is based on a feature we just mentioned: it charges defendants with conspiring to both (1) defraud the government and (2) violate the Anti-Kickback Statute. Although the alleged conspiracy has two objects, the offense charged is a single conspiracy. As far back as 1949, it was "well settled that the conspiracy may contemplate several offenses." *Burton v. United States*, 175 F.2d 960, 963 (5th Cir. 1949); *see also United States v. Duvall*, 846 F.2d 966, 975 n.8 (5th Cir. 1988) (labeling the argument Sanjar makes "frivolous").

Sanjar is, however, correct that Counts Eight and Eleven each charge separate offenses: (1) paying kickbacks and (2) receiving kickbacks. 42 U.S.C. § 1320a-7b(b)(1) (criminalizing receipt of kickbacks); *id.* § 1320a-7b(b)(2) (criminalizing payment of kickbacks). But the government's theory, reflected in both the indictment and the trial evidence, was that certain defendants paid kickbacks (Sanjar, Sajadi, and Hakimi), whereas others received them (Nunn and Manney). As there was no evidence that Sanjar ever received kickbacks, there is no risk that the jury convicted him of that crime. *See United States v. Vernon,* 723 F.3d 1234, 1262 (11th Cir. 2013) (holding that a count charging both paying and receiving kickbacks was not cause for reversal when the

9

indictment and trial evidence left no possibility that the duplicity defects led the jury to convict the defendant of the unfitting offense).

The indictment does not present any reversible error.

## IV.

We now reach the trial, during which the defendants contend the district court made erroneous evidentiary rulings. We review such rulings for abuse of discretion, subject to a harmful error analysis. *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012); *Chapman v. California*, 386 U.S. 18, 23 (1967) (explaining that error is not harmless if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction").

## A.

The first ruling is the district court's decision to allow four Spectrum patients to testify about their mental health. Hakimi says this was improper lay witness opinion testimony.

Much of the challenged testimony, however, is not opinion. A patient's drug history, what a patient told medical personnel, and the diagnosis a patient has received is factual testimony, subject as all evidence is to being challenged for its veracity.

Some of the testimony, such as the severity of a patient's mental condition, is more in the nature of the opinion testimony that Federal Rule of Evidence 701 addresses. Examples of this category include a patient's recollection that she was not experiencing visual or auditory hallucinations upon admission to Spectrum and was similarly not suffering acute psychotic symptoms. Another is a patient's testimony that he was not feeling badly enough to label his depression major.

Lay witnesses may offer opinion testimony if it is rationally based on their perception, helpful to determining a fact in issue, and not based on specialized knowledge. FED. R. EVID. 701. Even if such testimony requires

some specialized knowledge, it is admissible so long as the lay witness offers straightforward conclusions from observations informed by his or her experience. *See United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997).

The challenged testimony satisfies these requirements. Each patient spoke only to his or her condition. The testimony assisted the jury in determining whether patients required PHP services. And, even if the statements implicate specialized knowledge, they were informed by the patient's experience—they are the ones living with the mental illnesses. Allowing this testimony was not erroneous.

B.

Next is the claim that the district court should not have limited the examination of a federal agent who testified about some of Sanjar's postarrest statements. Among other things, the agent testified on direct that Sanjar said he did not care to know: (1) if kickbacks were paid at Spectrum and (2) that overuse of ambulances was rampant. On cross, defense counsel asked the agent about other postarrest statements Sanjar made, including the name of the outreach employee supervisor and that Roberts was fired for paying kickbacks. The court disallowed the inquiry on hearsay grounds. It also denied Sanjar's request to introduce a law enforcement report summarizing his statements, which the agent had reviewed before testifying.

When offered by the government, a defendant's out-of-court statements are those of a party opponent and thus not hearsay. FED. R. EVID. 801(d)(2). When offered by the defense, however, such statements are hearsay (the defendant may, of course, reiterate the out-of-court statements on the stand if he chooses to testify).

Sanjar tries to get around the hearsay problem by invoking the rule of optional completeness, citing both Federal Rule of Evidence 106 and its common law counterpart.

11

No. 15-20025

Rule 106 protects against written works being presented out of context. *United States v. Garcia*, 530 F.3d 348, 351 (5th Cir. 2008). It states that if a party offers part of a recorded statement, an adverse party may require the introduction of any other part that ought to be considered at the same time. FED. R. EVID. 106. The language of Rule 106 expressly limits it "to situations in which part of a *writing or recorded statement* is introduced into evidence." *Garcia*, 530 F.3d at 351 (emphasis added). That said, the Eleventh Circuit has held that testimony may nonetheless fall within the rule's ambit if it is "tantamount" to offering a recorded statement into evidence. *Id.* at 352 (citing *United States v. Pendas-Martinez*, 845 F.2d 938, 943 (11th Cir. 1988)). But we have held that this standard is not met in the situation here when the agent neither read from the report nor quoted it. *Id.* at 353. Rule 106 is thus inapplicable. Moreover, the Rule would only have required the introduction of the report; it does not address Sanjar's primary concern about the scope of cross examination.

The common law rule of completeness, which is just a corollary of the principle that relevant evidence is generally admissible, does provide a right to cross examine. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988). The rule comes into play, however, only when the additional inquiry is needed to "explain, vary, or contradict" the testimony already given. *United States v. Paquet*, 484 F.2d 208, 212 (5th Cir. 1973). The other statements by Sanjar that defense counsel sought to ask the agent about, many of which are assertions of innocence, were "not necessary to qualify, explain, or place into context" the limited statements the agent testified about on direct. *United States v. Self*, 414 F. App'x 611, 615 (5th Cir. 2011).[6]

---

[6] Under Fifth Circuit Rule 47.5.4, our unpublished cases are not precedential. We rely on this case and the other unpublished decisions cited in this opinion only to the extent they reflect consistent and well-reasoned analysis of these issues.

No. 15-20025

Related to the same agent testimony, Main contends the district court's limitation of cross examination violated the Confrontation Clause. *United States v. Skelton*, 514 F.3d 433, 439–40 (5th Cir. 2008). He contends the jury would have formed a substantially different impression of Sanjar's sincerity had the agent been allowed to confirm some of Sanjar's exculpatory statements. This argument misses the mark. The credibility of the testifying agent, not Sanjar, is the interest of the Confrontation Clause. *Id.* The district court did, moreover, permit some cross examination of the agent's testimony concerning Sanjar's postarrest statements, which in any event were not all that prejudicial because Sanjar did not admit guilt in those statements. The district court did not abuse its wide latitude over management of the trial by sustaining some objections to that line of questioning.

C.

The last disputed evidentiary ruling is the district court's decision to allow another agent to testify that a binder, dubbed the Nunn Binder because it documents referrals from and payments to Nunn, was found in Hakimi's office. Hakimi says this testimony was hearsay because the testifying agent did not actually seize the binder and thus must have been relying on another agent's statement to that effect.

The district court did not err in concluding the location of the binder was within the testifying agent's personal knowledge. The agent, who supervised the search, testified that he knew the location based on labels that agents used to designate different locations at Spectrum. In any event, any error in admitting this single statement was harmless in light of the other substantial evidence presented at the month-long trial showing that Hakimi paid kickbacks and meticulously monitored the referrals.

No. 15-20025

## V.

Defendants also see error in how the court instructed the jury.[7] We review the propriety of jury instructions for abuse of discretion, subject again to a harmless error analysis. *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015). In so doing, we consider whether the charge, as a whole, is a correct statement of law. *Id.*

## A.

Defendants' first objection is to the court's instruction on the Anti-Kickback Statute's safe harbor provision, which shields *bona fide* employees receiving income for their recruiting services from being found guilty under the Anti-Kickback Statute. They contend that it is an impermissible mandatory presumption. Such a presumption tells the jury it must infer a fact if the government proves certain predicate facts. *Id.* While a district court should not give such an instruction, it may instruct on permissive inferences, which suggest to the jury only a possible conclusion to be drawn if the government proves predicate facts. *Id.* In assessing whether an instruction is a mandatory presumption, we look first to its wording and then consider it in the context of the whole charge. *Id.*

The contested charge reads as follows: "If you find that any part of the payment to a defendant was made to compensate past referrals or to induce future referrals, that portion of the payment violates the Anti-Kickback Statute and is not subject to the safe harbor."

---

[7] Aside from the arguments about the instructions discussed below, Main contends for the first time on appeal that a factual unanimity instruction was required for the conspiracy to commit health care fraud because the "manner and means" section of that charge lists three different ways he helped the conspiracy. He cites no caselaw, nor are we aware of any, that requires unanimity as to the alleged manner and means, which is not an element of the conspiracy offense. The crime charged, and thus the issue on which a jury must be unanimous to convict a defendant under section 1349, is the conspiring to commit health care fraud.

14

The defendants' concern relates to the legal conclusion the instruction tells the jury to reach if it determines the payments were made for prohibited purposes.  It does not just define the scope of the safe harbor defense ("is not subject to the safe harbor"), but can also be read as requiring a conviction so long as that one fact concerning the purpose of the payments is proven ("that portion of the payment violates the Anti-Kickback Statute").  As Hakimi notes, there are elements beyond the existence of a kickback that the government must prove: that the defendant paid or received the kickback and acted knowingly and willfully.  42 U.S.C. § 1320a–7b(b).

Even read in isolation, we are not convinced that this safe harbor instruction fits within the due process cases dealing with mandatory presumptions.  That line of Supreme Court cases involves just that, presumptions.  *See, e.g.*, *Rose v. Clark*, 478 U.S. 570, 574 (1986) ("All homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption."); *Francis v. Franklin*, 471 U.S. 307, 315 (1985) ("The acts of a person of sound mind and discretion are presumed to be the product of the person's will . . . "); *Sandstrom v. Montana*, 442 U.S. 510, 513 (1979) ("[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.").  Such presumptions ask a jury to assume "that a fact exists because of the known or proven existence of some other fact."  BLACK'S LAW DICTIONARY 1375 (10th ed. 2014); *see also Cessa*, 785 F.3d at 185.  We recently applied this doctrine to an instruction not expressly framed in terms of a presumption but that required the jury to find certain evidence to be probative of an element of the crime.  *Cessa*, 785 F.3d at 184 ("[T]he commingling of illegal proceeds with legitimate business funds *is evidence of intent to conceal or disguise*.").

Unlike those cases, the safe harbor instruction is not telling the jury what evidence it must find probative or what presumptions it must apply; it

instead tells the jury the legal consequence of a factual finding it has the discretion to make. The challenged instruction thus more closely adheres to the fact/law allocation of power between judge and jury than do the classic presumptions that intrude on the jury's exclusive domain to decide the facts. In informing the jury of the legal consequences of its factfinding, it is akin to other instructions. Consider the pattern charge for entrapment: "If you should find beyond a reasonable doubt . . . the defendant was ready and willing to commit such a crime as charged in the indictment, whenever opportunity was afforded, and that government officers or their agents did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment." PATTERN JURY INSTRUCTIONS: FIFTH CIRCUIT (CRIMINAL) § 1.28 (2015).

The problem then is not one of presumptions, but rather that the instruction erroneously describes the legal consequence of a jury finding that part of the compensation was for referrals: that this means not just that the safe harbor defense is not applicable but also that the government has proven that the Anti-Kickback Statute was violated.[8] But the jury charge as a whole did not mislead the jury. The challenged safe harbor instruction was given only after the court had instructed the jury four times in general terms that the government must prove each defendant guilty beyond a reasonable doubt and then specifically told the jury that all elements of the kickback offenses must be proven by that same standard. Only after all this, and when addressing the safe harbor defense which it explained a defendant had to prove

---

[8] The instruction is an accurate statement of the law as it relates to the scope of the safe harbor defense. *United States v. Davis,* 132 F.3d 1092, 1094 (5th Cir. 1998) (rejecting argument that government must prove that a payment was for "no other purpose than inducing the referral of Medicare patients") (internal quotation marks omitted). But again, Hakimi's primary argument is that a rejection of the safe harbor defense does not mean the government has met its burden of proving all elements.

No. 15-20025

by a preponderance of the evidence, did the court give the challenged instruction. A jury logically working through the charge thus would have considered the safe harbor defense only after determining that the government had proven a violation of the statute. The language and structure of the entire charge therefore could not have led the jury to believe that this one statement made in the context of an affirmative defense relieved the government of its much-emphasized burden to prove each element of the Anti-Kickback statute.

B.

Main objects to the instruction that allowed the jury to conclude he had knowledge of the Medicare fraud conspiracy if he "deliberately closed his eyes to what would otherwise have been obvious to him." This instruction may be given when a defendant claims a lack of guilty knowledge and the evidence supports an inference of deliberate indifference. *Delgado*, 668 F.3d at 227.

The thrust of Main's defense was that he did not know about the criminal activity. That defense was rebutted with evidence showing (1) Main was aware of a high likelihood of illegal conduct because he was instructed to falsify medical records and knew patients were being cycled between inpatient and outpatient services at regular intervals which would not correspond to medical needs, and (2) Main did not follow up with Sanjar or Sajadi after a patient complained to him about a tardy kickback. This permitted the court to give the deliberate ignorance instruction.[9] *See United States v. Barson*, 845 F.3d 159, 166 (5th Cir. 2016).

---

[9] Sanjar also raises this issue but makes no argument regarding why the instruction was improper. In any event, the evidence likewise raises the requisite inferences as to him. As discussed above, Sanjar told a federal agent that he was not interested in learning about kickbacks.

No. 15-20025

## C.

Main next objects to the district court's refusal to instruct on good faith. Failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury. *United States v. Storm*, 36 F.3d 1289, 1294–95 (5th Cir. 1994). Both conditions exist here. The court told the jury that the defendants must have acted "with bad purpose either to disobey or disregard the law." And Main argued good faith during closing, asserting he merely performed his duties as a physician's assistant and provided treatment to the patients.

## D.

The last objection is to the instruction on a conspirator's liability for a fellow conspirator's crimes. *See Pinkerton v. United States*, 328 U.S. 640 (1946). Sanjar contends that (1) the instruction did not require a finding that the substantive offense was foreseeable, and (2) Wharton's Rule prohibits *Pinkerton* liability for a substantive violation of the Anti-Kickback Statute because in his view that crime requires multiple participants (the payor and payee of the kickback).[10]

## 1.

The district court's *Pinkerton* instruction said: "A conspirator is responsible for offenses committed by other conspirators if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy."

Sanjar argues the disjunctive language is error as *Pinkerton* liability applies only to crimes committed in furtherance of the conspiracy that were

---

[10] Main also contends that the indictment had to provide notice of *Pinkerton* liability. He cites no support for this argument, and we have held that our case law provides sufficient notice. *United States v. Jimenez*, 509 F.3d 682, 692 (5th Cir. 2007).

reasonably foreseeable.  Many of our cases, both recent and old, agree with Sanjar's formulation.  *See, e.g.*, *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016) ("Under *Pinkerton*, a conspirator can be found guilty of a substantive offense committed by a co-conspirator and in furtherance of the conspiracy, so long as the co-conspirator's acts are reasonably foreseeable." (internal quotation marks omitted)); *United States v. Heffington*, 682 F.2d 1075, 1083 (5th Cir. 1982) (citing *Pinkerton* to require both in furtherance of and foreseeability).  That is consistent with *Pinkerton* itself.  328 U.S. at 647–48 (noting the doctrine would not apply "if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement").

Somewhere along the way, our case law departed from this understanding and began omitting "foreseeability" as a requirement for *Pinkerton* liability; it was enough that the act was committed in furtherance of the conspiracy.  *See, e.g.*, *United States v. Thomas*, 348 F.3d 78, 84–85 (5th Cir. 2003); *United States v. Dean*, 59 F.3d 1479, 1490 n.18 (5th Cir. 1995).  The 2001 Pattern Jury Instructions thus included the disjunctive instruction given in this case.  PATTERN JURY INSTRUCTIONS: FIFTH CIRCUIT (CRIMINAL) § 2.22 (2001).  When that version of the pattern charges was in effect, we upheld that instruction given its support in some of our caselaw while recognizing that it departed from the traditional understanding of *Pinkerton* and created a circuit split.  *United States v. Armstrong*, 619 F.3d 380, 387 n.4 (5th Cir. 2010) (citing *United States v. Gonzalez*, 570 F.3d 16, 26 n.8 (1st Cir. 2009)).

Noting the concerns raised in *Armstrong*, the current Pattern Jury Instructions—issued after this case was tried—restore "foreseeability" and "in furtherance of" as independent requirements.  PATTERN JURY INSTRUCTIONS:

No. 15-20025

FIFTH CIRCUIT (CRIMINAL) § 2.17 (2015).  The better course is for district courts to follow the updated pattern and instruct the jury in the conjunctive as a finding of foreseeability mitigates due process concerns that sometimes arise with *Pinkerton*'s vicarious liability.  *See generally United States v. Alvarez*, 755 F.2d 830, 849–50 (11th Cir. 1985).

Nonetheless, using the 2001 Pattern Jury Instruction here was not reversible error.  First off, *Armstrong* rejected a challenge to that very instruction.  619 F.3d at 387.  And importantly, foreseeability is usually not disputed in a case like this one in which *Pinkerton* liability is extending only to the substantive offense that is the object of the conspiracy.  *United States v. Wynter*, 379 F. App'x 841, 848–49 (11th Cir. 2010) (distinguishing cases "in which the substantive crime that is the subject of the *Pinkerton* charge is also one of the primary goals of the alleged conspiracy" from "cases in which the substantive crime is not a primary goal of the alleged conspiracy, but directly facilitates the achievement of one of the primary goals").  In other words, how could the payment of kickbacks not be foreseeable to a participant in a kickback conspiracy?  Foreseeability is more often an issue when the substantive offense for which *Pinkerton* liability is being sought is not an object of the conspiracy, such as when prosecutors are seeking to hold drug trafficking conspirators liable for firearms and murder offenses committed by fellow dealers.  *See, e.g.*, *United States v. Gonzales*, 841 F.3d 339, 351–53 (5th Cir. 2016).  Failure to require a foreseeability finding is not reversible error.

2.

Although framed in terms of a challenge to the *Pinkerton* instruction, Sanjar's Wharton's Rule argument is really about whether conspiracy to violate the Anti-Kickback Statute and an actual violation of that law can be punished as separate crimes. The general rule is that "a conspiracy and the substantive offense that is its immediate end are discrete crimes for which

separate sanctions may be imposed." *Iannelli v. United States*, 420 U.S. 770, 771 (1975). Wharton's Rule, named after the nineteenth century treatise writer who summarized the doctrine, is an exception. *Id.* at 773. It provides that when the substantive crime requires more than one actor (adultery is the anachronistic example Wharton cites), conspiracy should not be additional punishment to a crime that already requires concerted action.[11] *Id.* at 772–74 (citing 2 F. WHARTON, CRIMINAL LAW § 1604, p. 1862 (12th ed. 1932)). The narrow rule is implicated "[o]nly when it is *impossible under any circumstances* to commit the substantive offense without cooperative action." *United States v. Payan*, 992 F.2d 1387, 1390 (5th Cir. 1993) (citing *Gebardi v. United States*, 287 U.S. 112, 122 (1932)). That is not the case with the Anti-Kickback Statute. One can violate it just for soliciting a kickback. 42 U.S.C. § 1320a-7b(b)(1). Convictions for both conspiracy to violate the Anti-Kickback Statute and actually violating that law are allowed.

## VI.

In response to the instructions it was given, the jury returned guilty verdicts on all counts except for the kickback charge in Count Nine. Defendants challenge the sufficiency of the evidence to support these counts. We must affirm the verdict unless no rational juror could have found guilt beyond a reasonable doubt. *Njoku*, 737 F.3d at 62 (instructing that we view the evidence "in the light most favorable to the government," draw all inferences "in support of the jury's verdict," and "ask whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

---

[11] As is often the case, there is an exception to this exception. Wharton's Rule is just a "judicial presumption, to be applied in the absence of legislative intent to the contrary." *United States v. Payan*, 992 F.2d 1387, 1391 (5th Cir. 1993) (quoting *Iannelli*, 420 U.S. at 782) (holding that Congress intended for conspiracy and aiding and abetting to be separately punishable).

No. 15-20025

A.

The defendants convicted of the health care fraud offenses—all but Manney, who just faced kickback charges—though separately challenging their individual convictions raise similar legal issues. To be guilty of health care fraud, a defendant must have knowingly and willfully executed a scheme to defraud a government health care program like Medicare. 18 U.S.C. § 1347; *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). Willfully joining with another to engage in such a scheme, with awareness of the agreement's unlawful purpose, is a conspiracy to commit health care fraud. 18 U.S.C. § 1349; *Njoku*, 737 F.3d at 63.

Echoing their argument concerning the admissibility of patient testimony about mental conditions, defendants assert that expert testimony from a doctor who reviewed the patient files is required for a jury to find that the PHP treatment was not medically necessary. As an initial matter, this argument focuses on only one of the theories the government advanced for why the PHP billings were fraudulent. It ignores the extensive evidence showing that PHP treatment, whether needed or not, was not being provided in the "Mickey Mouse" facility. That alone supports the findings of health care fraud.

But we also do not see any basis for a categorical rule that expert testimony is required for a jury finding of medical necessity. Defendants cite medical malpractice cases for such a requirement. In addition to those being state law civil cases, medical malpractice focuses on whether a doctor properly treated a patient's condition, not on whether the patient actually had the condition. It makes sense that expert testimony from physicians is needed for the former. But on the latter question, the patient certainly has something to offer. Just about any visit to a doctor begins with self-reporting: What are your symptoms? When did they start? How severe is the pain?

22

No. 15-20025

The importance of self-reporting, especially for mental illnesses for which there is often little corroborating visual evidence that modern medicine has for many physical ailments, is evident from the testimony presented by the doctor called by Sajadi.  He did not meet any of the patients in arriving at a diagnosis; he simply reviewed the files Spectrum maintained.  Much of what is in those files is self-reporting.  Take one representative patient as an example.  His file notes that "he has been having panic attacks which cause him to be unable to breathe" and that "he fear[s] he is dying".  It further states that his "anxiety [has] increased," "[h]e has decreased sleep", and he "is unable to cope with life stressors."  Finally, the file notes that the patient denies "suicidal or homicidal ideation," "hallucinations," or "delusions."  In finding that the patient's description of symptoms was all he needed to know, Sajadi's own expert recognizes the crucial role that patient reporting plays in mental health evaluations.

Notably, defendants point us to no other topics of testimony in which federal criminal law requires expert testimony to support a conviction.  We decline to impose such a requirement here.  Doing so would be at odds with the jury's considerable discretion to weigh evidence, both direct and circumstantial, that may prove or disprove an element of the offense.  *See United States v. Patel*, 485 F. App'x 702, 709 (5th Cir. 2012) (noting facts other than expert testimony which are probative of medical necessity).  The government's failure to call an expert may influence that weighing and is subject to attack during cross examination and closing argument.  Indeed, in some cases it may even doom its case if the jury wants that expertise.  And perhaps there are more technical medical diagnoses on which expert testimony would be needed to prove medical necessity.  But the supposed conditions for which Spectrum was billing the government—severe depression and anxiety disorder, among others—are common ailments suffered and understood by

millions.  The patients' perceptions of their conditions, along with the other strong indicia of fraud involving failure to evaluate patients, paying patients, and falsifying medical charts, supports the jury's finding of guilt.

The bedrock principles just discussed concerning the jury's role in weighing evidence also dispose of defendants' other challenges to the fraud convictions.   To the extent they identify inconsistencies in the patients' testimony, that credibility determination is for the jury to make.  As for the alleged absence of evidence showing fraudulent intent, the mindset needed for fraud and conspiracy can be, and usually is, proven by the circumstances.

The circumstantial evidence of fraudulent intent in this case is similar to what courts have found sufficient in other health care fraud schemes.  Sanjar and Sajadi had employees falsify patient files to comport with PHP requirements, feigned participation in patient evaluations, and, as the owners of Spectrum, reaped substantial profits from the scheme.  *See Moran*, 778 F.3d at 961 (inferring knowledge from defendant's managerial control, delegation of tasks implementing the fraud, and orders to falsify pertinent files); *Willet,* 751 F.3d at 340; *United States v. Tellison*, 637 F. App'x 186, 187 (5th Cir. 2016); *United States v. Bajoghli*, 785 F.3d 957, 966–67 (4th Cir. 2015).   Hakimi oversaw the operation, tracking hours and authorizing deficient and overly crowded therapy sessions to meet the weekly twenty-hour PHP billing condition.    *See Moran*, 778 F.3d at 953, 961 (finding that an office administrator with like responsibilities had the requisite mindset).  Main, for his part, carried out Sanjar and Sajadi's commands to falsify medical charts, misrepresenting the symptoms and complaints made by patients.  *Njoku*, 737 F.3d at 63.  He also saw patients being cycled between PHP and IOP services at regular intervals and did nothing after being confronted by a patient about a tardy kickback. *See United States v. Umawa Oke Imo,* 739 F.3d 226, 237 (5th

Cir. 2014) (inferring knowledge from proximity to unlawful acts and complicity in the continuation of that illegal activity).

Sufficiency is a closer question for Nunn.  The evidence showing her involvement in the kickback scheme is plentiful.  But as discussed, a kickback violation can occur without any fraudulent billing.  That said, Nunn did more than just pay and receive kickbacks.  She graduated her payments to patients based on whether they were receiving PHP or IOP treatment and spent lots of time at Spectrum, where she could see the patients and provision of care (or lack thereof).  This evidence, while thinner, is just enough given the deference we owe the jury.  *See United States v. Hunter*, 628 F. App'x 904, 906 (5th Cir. 2015) (holding that defendant's sophisticated practice and constant presence at the health care facility perpetrating the fraud sufficed to show defendant was aware of the scheme to defraud Medicare).

We uphold both the conspiracy to commit health care fraud and substantive health care fraud convictions.

### B.

The Anti-Kickback Statute is violated when a defendant knowingly and willfully gives or receives a benefit for referring a party to a health care provider for services paid for by a federal health care program.  *Njoku*, 737 F.3d at 63; 42 U.S.C. § 1320a–7b(b).  A conspiracy to violate that law requires an agreement to do so, knowing and voluntary participation in the conspiracy, and an overt act by one member of the conspiracy in furtherance of the unlawful goal.  *Id*. at 63–64.

Defendants convicted of the kickback offenses—all but Main, who faced only fraud charges—allege similar deficiencies in the evidence.  They first invoke the safe harbor defense which we previously discussed in terms of the jury instruction.  The statute has a safe harbor for payments to *bona fide* employees for their provision of otherwise covered services, like recruiting

patients.  42 U.S.C. §1320a–7b(b)(3)(B).  Factors relevant to determining if an employment relationship is *bona fide* include the manner of payment, whether the work is part of the employer's regular business, and the employer's control over work hours.  *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013).  Nunn and Manney, while called Spectrum employees by certain witnesses, were paid per referral, sought referrals on their own, and kept no regular office hours.  From this evidence, a rational juror could have determined Nunn and Manney were not *bona fide* employees and thus the safe harbor did not protect the payments they received.

Defendants next maintain that even if payments were made to nonemployees, the government again failed to show defendants had the requisite mindset.  The evidence, however, supports the jury's finding that defendants acted knowingly and willfully.  Sanjar, Sajadi, and Hakimi meticulously monitored patient referrals, tracking patients, their referrers, and the billings on their claims.  Nunn and Manney received referral fees from Sanjar, Sajadi, and Hakimi equaling roughly ten percent of the money generated by their clients.  Roberts testified that Manney expressly said he required payment for referrals and that Nunn cut Roberts out of the scheme and started dealing directly with Sanjar, Sajadi, and Hakimi.  Nunn's paying her patients in cash, delivered in envelopes, also shows awareness of the unlawful nature of the scheme.  A rational juror could conclude that each defendant willfully paid or received kickbacks in violation of the Anti-Kickback Statute or conspired to do so.  *See Moran*, 778 F.3d at 955–56, 962; *United States v. Turner*, 561 F. App'x 312, 318–19 (5th Cir. 2014).  As with the fraud convictions, the evidence supports the convictions on the kickback counts.

## VII.

Having affirmed defendants' convictions, we now consider challenges to their punishment.  None claim error with respect to the custodial sentences

No. 15-20025

the district court imposed, but Sanjar, Sajadi, and Main contest the propriety of the restitution and forfeiture orders. [12]  This is also where the government brought a cross appeal; it maintains the district court lacks the power to offset forfeited funds against the restitution order.

## A.

The court required Sanjar and Sajadi to pay restitution of $8,058,612.39 and Main to pay $4,044,409.70.  Most of these losses were to the Medicare Part A program, with smaller amounts attributable to Medicare Part B and Medicaid. [13]  Defendants argue it was error to include in the restitution amount Medicare Part A and Medicaid losses given that the indictment only mentions Medicare Part B.

When the offense of conviction involves a "scheme," the restitution statute broadens the definition of victim to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme." *United States v. Maturin,* 488 F.3d 657, 661 (5th Cir. 2007) (quoting 18 U.S.C. § 3663A(a)(2)).  In such a situation, restitution may include losses suffered by victims not named in the indictment so long as they are victims of the scheme described therein.  *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995)

Conspiracy to commit health care fraud requires a scheme.  18 U.S.C. § 1349.  The scheme in which Sanjar, Sajadi, and Main participated caused losses to both Medicare programs as well as Medicaid.  Indeed, the same

---

[12] Aside from the issues considered below, Nunn maintains that her cumulative $500 special assessment violates the Double Jeopardy Clause, citing *United States v. Kimbrough*, 69 F.3d 723, 728–29 (5th Cir. 1995).  *Kimbrough*, however, deals with the issue of multiplicitous counts; it does not forbid a court from the standard practice of assessing the mandatory $100 assessment for each conviction as was done here.  *Id.* at 729.

[13] Medicaid assists low-income patients of all ages with medical expenses.  Medicare, on the other hand, offers medical insurance to people who are either over the age of 65 or suffer a disability.  Medicare is divided into various parts.  Part A covers, among other things, hospital care, nursing home care, and home health services.  Part B covers medical services, as well as ambulance services and durable medical equipment.

No. 15-20025

fraudulent claims resulted in payments from Medicare and Medicaid. It was not improper to include losses to all the government programs victimized as part of the scheme. *See United States v. Dhafir*, 342 F. App'x 702, 706 (2d Cir. 2009) (allowing restitution to Medicaid even though indictment mentioned only Medicare fraud).

Even if all the programs are victims, defendants argue the district court erred in including all of Spectrum's PHP billings to those programs rather than crediting against the restitution award reimbursements for legitimate services. They rely on the principle that loss in a health care fraud case cannot include any amount the government would have paid in the absence of the crime.[14] *United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012).

The government presented ample evidence, recited above, showing Spectrum's entire PHP practice was fraudulent. Defendants, for their part, offered little to no concrete evidence to rebut that showing. They relied entirely on evidence premised on shaky grounds: expert testimony that Spectrum's patient records indicate the patients qualified for PHP services. Such testimony, however, assumes the accuracy of the records (the expert never talked to the patients), and substantial evidence showed they were, in fact, falsified. The district court did not err in declining to apply a restitution credit.

In addition to challenging the restitution order, Main also appeals the forfeiture money judgment issued against him in the same amount: a joint and several obligation of $4,044,409.70 that represents the gross proceeds the conspiracy obtained from the Medicare fraud during the time Main worked at

---

[14] Take for example a doctor billing Medicare for medically necessary drugs and drug-administration services when, in fact, patients self-administer drugs. The fraud, of course, is billing for administration services that are not provided. The drugs, however, are necessary and thus reimbursable regardless of the fraud. The restitution award in such a case can include only the amounts for the administration services not provided. *See United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008).

Spectrum.  In his original briefing and argument to the panel, Main argued only that the forfeiture judgment violates the Eighth Amendment because the money he received from the fraud—just his wages, which totaled about $120,000—was a small fraction of the more than $4 million in illegal proceeds he was ordered to repay.  At the rehearing stage, Main contended for the first time that the forfeiture exceeded what is allowed under the governing statute, 18 U.S.C. § 982(a)(7), because it was based on the proceeds obtained by the entire conspiracy rather than just the proceeds Main received.  Main noted that the Supreme Court had agreed to hear a case addressing this statutory question, *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).  We delayed ruling on the rehearing request to see what *Honeycutt* would say.

The Supreme Court agreed with Main, holding that forfeiture pursuant to the statute governing drug cases, 21 U.S.C. § 853(a)(1), "is limited to property the defendant himself actually acquired as the result of the crime." *Id*. at 1635.  It rejected the government's position that the statute allowed joint and several forfeiture liability for conspirators.[15]  *See id*. at 1632–35.  As the government concedes, the same analysis should apply to the statute authorizing forfeiture in health care fraud cases, 18 U.S.C. § 982(a)(7).  Like the drug forfeiture statute, the text of the health care fraud forfeiture statute does not provide for joint and several or co-conspirator liability.  Like the statute *Honeycutt* considered, section 982(a)(7) allows forfeiture to reach property "that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense."  18 U.S.C. § 982(a)(7); *see* 21 U.S.C. § 853(a)(1) (authorizing forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the

---

[15] In contrast to the forfeiture statutes, the restitution statute expressly authorizes joint and several liability.  18 U.S.C. § 3663A(a)(1), 3664(h).  Main does not argue that *Honeycutt* impacts the restitution award.  So we do not disrupt the restitution order.

result of such violation"). And the forfeiture statute for fraud offenses incorporates many of the drug law provisions on which *Honeycutt* relied in rejecting joint and several liability. 18 U.S.C. § 982(b)(1) (incorporating 21 U.S.C. §§ 853(c), 853(e), and 853(p)); *Honeycutt*, 137 S. Ct. at 1633–35 (discussing all three of those provisions of the drug statute); *cf. United States v. Gjeli*, 867 F.3d 418, 427–28 (3d Cir. 2017) (holding that *Honeycutt* applies to the forfeiture statutes governing RICO cases, 18 U.S.C. § 1963, because the statute was "substantially the same as the one under consideration in *Honeycutt*").

The forfeiture statute thus does not allow Main to be responsible for any amount beyond the proceeds of the Medicare fraud that he obtained. But is he able to obtain relief based on this statutory argument given that "[g]enerally speaking a party may not raise an argument for the first time in a petition for rehearing"? *Browning v. Navarro*, 894 F.2d 99, 100 (5th Cir. 1990). There is an exception to this principle when the new argument relies on an intervening Supreme Court decision. *Lowry v. Bankers Life & Cas. Retirement Plan*, 871 F.2d 522, 523 n.1 (5th Cir. 1989). So we will forgive Main's failure to raise the statutory argument in his original briefing to this court. But that does not allow him to escape the demanding requirements of plain error review that apply to any issue not presented to the district court. FED. R. CRIM. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining that to satisfy Rule 52(b) there must be "error" which is "plain" and "affects substantial rights," and that even then the district court has discretion to correct the forfeited error, "unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings").

The nature and substantial impact of this error allow Main to clear those high hurdles. The first two requirements are satisfied because *Honeycutt* renders the joint-and-several award plainly erroneous. *See Henderson v.*

30

## No. 15-20025

*United States*, 568 U.S. 266 (2013) (holding that error is plain as long as the error was plain at the time of appellate review).  The vast disparity between the over $4 million dollar forfeiture the district court ordered pre-*Honeycutt* and the $120,000 or so the law now allows is a substantial impact on Main's rights.  The magnitude of that difference, along with the nature of the error that resulted in an award in excess of what the statute permits, also seriously undermines the fairness and integrity of the proceeding.  *United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007) (correcting restitution order under plain error review because the statute does not allow for awards greater than the loss caused).  We therefore exercise our discretion to vacate the forfeiture order entered against Main and remand for the determination of an award based on the property that Main obtained as a result of the fraud.[16]

### B.

The government's sole issue on appeal concerns the district court's decision to offset defendants' restitution obligations with any amount collected pursuant to the forfeiture order.  The district court thought it proper to do so because there was no private victim, meaning the government would receive both the restitution amount and any forfeited proceeds.  The government contends this was error.  We agree.

Although we have yet to consider whether a district court may offset restitution orders with forfeited funds, our decision rejecting a defendant's challenge to a district judge who refused to do so is instructive.  *United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009).  *Taylor* involved a conviction for fraud in obtaining disaster relief assistance.  *Id.* at 561.  At sentencing, the district court refused to offset Taylor's restitution obligation with his required

---

[16] We need not address Main's other challenges to the forfeiture order, including the constitutional claim we previously addressed, because we are vacating the award under *Honeycutt*.

forfeiture payments. *Id.* at 566. We rejected Taylor's argument that requiring both restitution and forfeiture is impermissible because the government is the recipient of both sums—the very reason motivating the district court's decision here. *Id.* at 566. We reasoned that although the government was the nominal recipient of the two, the Federal Emergency Management Agency was the victim and thus entitled to full restitution whereas the Department of Justice would seize forfeited funds. *Id.* We also cited decisions from other circuits that reject similar challenges. *Id.* at 567 (citing *United States v. Alalade*, 204 F.3d 536, 540 (4th Cir. 2000); *United States v. Emerson*, 128 F.3d 557, 566–67 (7th Cir. 1997); *United States v. Leon–Delfis*, 203 F.3d 103, 116 (1st Cir. 2000); *United States v. Bright*, 353 F.3d 1114, 1124 (9th Cir. 2004)).

Although those circuits considered appeals in the same posture as *Taylor* (challenging a refusal to offset as opposed to a requirement to offset), their reasoning that a district court is without statutory authority to offset restitution with amounts forfeited to the government answers the question we face. *Alalade*, 204 F.3d at 540 (noting that the plain language of the restitution statute does not grant the district court discretion to reduce the amount of restitution by the amount ordered to be forfeited); *Emerson*, 128 F.3d at 566–67 (stating that the district court has the statutory authority to impose both restitution and forfeiture, and there is no legal authority to offset one another). Like *Taylor*, those cases rely on the language of the Mandatory Victim Restitution Act requiring courts to order full restitution without an exception for amounts forfeited. 582 F.3d at 567; *Alalade*, 204 F.3d at 540; *Emerson*, 128 F.3d at 566–67; *Bright*, 353 F.3d at 1124; *Leon–Delfis*, 203 F.3d at 116.

No. 15-20025

A criminal forfeiture statute also contemplates that it is for the Attorney General to decide whether to offset. *See* 21 U.S.C. § 853(i)(1)[17] (granting the Attorney General the authority to restore forfeited property to victims, which is the mechanism for using forfeited funds to offset restitution obligations). And restitution and forfeiture serve distinct purposes. *Taylor*, 582 F.3d at 566. Restitution is remedial in nature; its goal is to make the victim whole. *Id.* Forfeiture is punitive; it seeks to disgorge any profits or property an offender obtains from illicit activity. *Id.*

As suggested by *Taylor* and stated more directly by other circuits, both restitution and criminal forfeiture are mandatory features of criminal sentencing that a district court does not have authority to offset. We have difficulty seeing why amounts the Department of Justice collects through forfeiture should not be transferred to the victim agency. And that appears to be DOJ policy. UNITED STATES DEP'T OF JUSTICE, ASSET FORFEITURE POLICY MANUAL, § 12E.2 (2016) (explaining that "[w]hen a defendant lacks the resources to make full restitution, Department of Justice . . . policy is to collect and marshall assets for the benefit of victims using available means [that include] turn[ing] over 'liquid assets' . . . to the clerk of court to be applied to restitution" and the restoration process for forfeited assets); *id.* § 12A.1 (noting that federal agencies can qualify as a victim under the regulations governing forfeiture). But Congress left it to the executive branch to decide whether to follow through on that sensible policy.

---

[17] This statute applies to forfeiture for drug convictions, but its procedures are incorporated into the general criminal forfeiture statute. 18 U.S.C. § 982(b)(1).

No. 15-20025

\*     \*     \*

We therefore VACATE the forfeiture order entered against defendant Main and REMAND his case for further proceedings consistent with this opinion and *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). As to all the defendants, we MODIFY the restitution and forfeiture orders to eliminate the offset. The judgment is AFFIRMED in all other respects.