# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2025

Lyle W. Cayce

Clerk

_____

No. 22-11208

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

BRUCE STROUD; BOBBI STROUD,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 3:19-CR-439-1,
3:19-CR-439-2

_____

Before DAVIS, HIGGINSON, and DOUGLAS, *Circuit Judges*.

PER CURIAM:[*]

Bruce Stroud and Bobbi Stroud challenge their jury convictions of conspiring to violate, and violating, the Medicare Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b. We find no error and AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-11208

## I.    BACKGROUND

Following a twelve-day trial, a federal jury convicted both Bruce and Bobbi Stroud (hereinafter separately "Bruce" and "Bobbi") of one count of conspiracy to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)–(2); and seven counts of paying or offering to pay healthcare kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and aiding and abetting that offense in violation of 18 U.S.C. § 2.

The defendants, Bruce and Bobbi, are a married couple. They, along with codefendant Kenric Griffin,[1] were involved with three durable medical equipment (DME) companies: New Horizons Durable Medical Equipment LLC (New Horizons); 4B Ortho Supply, LLC (4B Ortho); and Striffin Medical Supplies, LLC (Striffin) (collectively, the DME Suppliers). Bruce was an owner and operator of all three companies, and Bobbi was an officer of 4B Ortho and an employee of New Horizons and Striffin.

The DME Suppliers provided Medicare beneficiaries various types of orthotics, such as back, knee, and wrist braces. Between January 2017 and April 2019, the DME Suppliers sought over $12 million in Medicare reimbursements for filling equipment orders, and ultimately collected over $6 million in proceeds. During that span, they also paid more than $3 million in kickbacks to two Florida-based marketing companies: TrueAlliance Health Group, LLC (TrueAlliance) and U.S. Care Associates, LLC (U.S. Care).

On paper, TrueAlliance and U.S. Care offered marketing and back-office services, but their true business model consisted of telemarketers cold calling a roster of possible Medicare beneficiaries about DME. If a call

---

[1] Kenric Griffin was convicted of the same eight offenses but did not file a notice of appeal.

2

recipient showed interest in DME, and had verifiable Medicare coverage, the marketing companies would arrange a telemedicine appointment for the recipient. The referred telemedicine doctors wrote DME prescriptions for nearly all of the beneficiaries they saw and, in return, received kickbacks from the marketing companies. Those prescriptions did not dictate where they were to be filled; instead, the marketing companies provided the doctor's order, along with the Medicare beneficiary's contact information, to one of the DME Suppliers in exchange for a kickback. The DME Suppliers submitted reimbursement claims to Medicare. The DME Suppliers were Arkansas- or Texas-based, but the prescriptions they filled were mostly written for Medicare beneficiaries residing in other states. Indeed, the DME Suppliers delivered devices to nearly all states in the continental United States.

To conceal their scheme, each of the DME Suppliers entered into written contracts with the marketing companies. These "marketing and sales agreements" provided that the defendants would pay a flat, weekly fee in exchange for marketing and other back-office services.

But under the true business model, established through oral agreement, the defendants would pay the marketing companies kickbacks only for patient referrals yielding a Medicare payout. Additionally, there was no fixed subscription fee: instead, they negotiated kickback rates to be paid by the DME Supplier based on the price of the orthotic device that was supplied. The amount the defendants paid could, and often did, vary each week.[2] The weekly payment corresponded to the number of Medicare-reimbursed doctor's orders a marketing company referred to the defendants.

---

[2] The weekly payment varied at the behest of the DME Supplier (e.g., if it desired to purchase additional orders on a given week).

And if the DME Suppliers did not get reimbursed (e.g., because the beneficiary did not have active Medicare coverage or chose to return the device), the defendants requested a "credit" from the marketing company supplying that order.

Bruce and Bobbi meticulously monitored their patient referrals using spreadsheets created in collaboration with TrueAlliance and U.S. Care. The Strouds used these records to ensure that they reaped the full benefit from their kickbacks to the marketing companies: their weekly referral fee corresponded to claims reimbursable by Medicare. The Strouds reaped over $1 million from the scheme.

The twelve-day trial ended in the convictions of both Bruce and Bobbi on an eight-count superseding indictment. Count one charged the defendants with conspiracy to defraud the United States and to pay and receive healthcare kickbacks in violation of the AKS. Counts two through eight charged them with substantive violations of the AKS and aiding and abetting those violations; each of these seven counts charged a specific kickback payment from the defendants to one of the marketing companies.

At trial, the government presented documentary evidence of the defendants' kickback scheme, including numerous invoices and emails documenting the arrangement. Bruce's and Bobbi's involvement in the fraud scheme was supported by testimony from representatives of TrueAlliance (William Novack) and U.S. Care (Emmanuel Silva and Sean Aaronson).[3] Novack, Silva, and Aaronson gave detailed testimony about their relationships with Bruce and Bobbi and the details of the kickback scheme. For example, they testified that TrueAlliance and U.S. Care sent the DME Suppliers two invoices every week: the first tracked the sham contract's

---

[3] Each of these witnesses pled guilty their role in this scheme.

terms for use when Medicare auditors appear, and the second tracked the actual scheme and included detailed information about the patients and their corresponding DME orders.

Bruce and Bobbi primarily argued to the jury that they acted in good faith and relied on the advice of a healthcare compliance attorney who told them their conduct was lawful. However, the attorney testified that the defendants withheld information about the true nature of their arrangements with the marketing companies. The attorney agreed that her advice would have changed if that material information were disclosed.

Bruce and Bobbi each made and renewed Rule 29 motions for a judgment of acquittal, which the district court denied. Their motions were based on a general sufficiency-of-the-evidence challenge. Their Rule 33 motion for a new trial similarly renewed their earlier general challenges to the sufficiency of the evidence.

## II. DISCUSSION

On appeal, the Strouds accept that TrueAlliance and U.S. Care obtained, through extensive solicitation calls, a roster of Medicare beneficiaries and obtained doctor's orders for those beneficiaries for DME. The defendants do not dispute that they paid TrueAlliance and U.S. Care more than $3 million to fill those doctor's orders which permitted the defendants to deliver orthotics to beneficiaries. According to the Strouds, they simply paid TrueAlliance and U.S. Care for doctor's orders, not for "referrals" of a patient. But the Strouds paid for much more than doctor's orders; they paid for orders only belonging to Medicare-eligible beneficiaries. The defendants made sure they paid kickbacks for such orders because they were interested in only filling prescriptions resulting in Medicare reimbursement.

No. 22-11208

As discussed below, Bruce's and Bobbi's principal argument is that the government failed to introduce sufficient evidence to establish the guilt of either Bruce or Bobbi. Bobbi also challenges the sufficiency of evidence to support her conspiracy conviction. She argues alternatively that the district court plainly erred in declining to strike sua sponte testimony by two government witnesses, Novack and Silva, that they "conspired with" her. Bruce brings a constitutional challenge to the district court's restitution order; he concedes this challenge was not raised in the district court.

## A.    Sufficiency of the Evidence

Bruce's and Bobbi's arguments on appeal primarily challenge the sufficiency of the evidence on which their convictions are based. "The standard of review for sufficiency-of-the-evidence challenges 'depends on whether the claims were preserved.'"[4] We review a preserved sufficiency-of-the-evidence claim de novo, according "substantial deference to the jury verdict."[5] "Under this standard, we 'must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

---

[4] *United States v. Lamartiniere*, 100 F.4th 625, 651 (5th Cir. 2024) (quoting *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018)).

[5] *Suarez*, 879 F.3d at 630 (quoting *United States v. Delgado*, 672 F.3d 320, 330–31 (5th Cir. 2012) (en banc)); *see also United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001))).

No. 22-11208

elements of the crime beyond a reasonable doubt.'"[6] "[A] defendant seeking reversal on the basis of insufficient evidence swims upstream."[7]

Bruce and Bobbi contend on appeal that the evidence was insufficient to support the verdict because no evidence demonstrated that the beneficiaries were referred to providers. At the outset, we exclude the possibility that the statutory term "induce," by itself, refers to inducement of beneficiaries. The plain language of the statute is leveled at prohibiting the inducement of the referring party.

Bobbi and Bruce also claim that no "referral" was made because the prescription did not assign a party to provide an orthotic. This assumes the doctor who wrote the prescription is the only party who could qualify as the referring person. But the statute is not drawn so narrowly to limit the referring person to the prescribing doctor. Our caselaw, discussed below, is also inconsistent with this interpretation.

The statute provides:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person *to induce such person . . . to refer* an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program [e.g., Medicare], . . . shall be guilty of a felony . . . .

---

[6] *United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc)).

[7] *United States v. Capistrano*, 74 F.4th 756, 766 (5th Cir. 2023) (quoting *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018)).

No. 22-11208

42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added). "In other words, the AKS 'criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program.'"[8] The jury instructions given by the district court for the substantive AKS violations (counts two through eight) mirrored this provision.[9]

Under the Strouds' proposed reading of § 1320a-7b(b)(2)(A), a violation occurs only if a third person, in exchange for a kickback, persuades a named Medicare beneficiary to purchase a device from a particular DME Supplier or if the doctor's prescription designates a particular DME

---

[8] *United States v. Gibson*, 875 F.3d 179, 187 (5th Cir. 2017) (quoting *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004)).

[9] The district court charged the jury that it could only convict the defendants in the violation of § 1320a-7b(b)(2)(A) if it found the following elements:

*First*:   That the defendant paid or offered to pay any renumeration, including any kickback, bribe, or rebate;

*Second*: That the remuneration was paid or offered to refer an individual to [New Horizons], [Striffin], or [4B Ortho], for the furnishing or arranging the furnishing of any item or service;

*Third*:   That the item or service was one for which payment was or might be made, in whole or in part, under a Federal healthcare program; and

*Fourth*: That the Defendant acted knowingly and willfully when paying or offering to pay the remuneration.

The district court further instructed the jury about two alternative theories of liability on this charge: aiding-and-abetting liability under 18 U.S.C. § 2 and co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). The Strouds raise no objection to the instructions on appeal, including the "referral" element of the principal offense, and have not argued as a matter of due process that the government impermissibly varied its proof from the crimes with which they were charged. Thus, they accept that they were charged under § 1320a-7b(b)(2)(A) and that the jury was properly instructed accordingly.

No. 22-11208

Supplier. This is true, Bruce and Bobbi claim, even if the kickbacks were given directly to the decisionmaker, here TrueAlliance and U.S. Care.

The Strouds' reading of § 1320a-7b(b)(2)(A) is contrary to the text of the statute. § 1320a-7b(b)(2)(A) prohibits referrals paid to "*any* person" who "induce[s]" another. (emphasis added). The statute does not textually limit the identity of that "person." Indeed, as this Court has repeatedly emphasized:

> [§ 1320a-7b(b)(2)(A)] prohibits payments to "any person," so long as the payment is made with the requisite intent: The payer must "knowingly and willfully" offer or make a payment to induce the recipient [] "to refer an individual to a person" for the provision of a covered healthcare good or service . . . .[10]

Some of our cases have emphasized that kickback payments should be to a relevant decisionmaker; that condition is also satisfied here.[11] The Strouds do not meaningfully dispute that TrueAlliance and U.S. Care decided which supplier would fill the doctor's DME order.

In *United States v. Miles*, this Court expressly acknowledged that there are "certain situations where payments to non-doctors would fall within the scope of the statute."[12] The panel referred to *United States v. Polin*, 194 F.3d 863 (7th Cir. 1999), as an example. In *Polin*, the Seventh Circuit held that payments to a pacemaker salesman qualified as a kickback under the AKS because, although a physician would formally direct each patient to a

---

[10] *United States v. Shoemaker*, 746 F.3d 614, 627 (5th Cir. 2014); *see also Gibson*, 875 F.3d at 189 ("The statute criminalizes payments made to 'any person' with the requisite intent.").

[11] *See United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir. 2024); *Shoemaker*, 746 F.3d at 628; *Miles*, 360 F.3d at 479.

[12] 360 F.3d at 480.

provider of pacemaker monitoring services, the salesman had a key role in selecting the service provider who would pay the kickbacks.[13] There is no meaningful difference between the salesperson in *Polin* and the decisionmakers in this case, TrueAlliance and U.S. Care. Thus, even if, as the Strouds urge, the physicians who wrote the prescriptions did not choose which company filled those prescriptions, the kickbacks in this case were paid to TrueAlliance and U.S. Care ("any person") to direct individuals to the DME Suppliers (also "person[s]") for provision of items that would be paid by Medicare.

The Strouds refer us to *United States v. Cooper*, 38 F.4th 428 (5th Cir. 2022), which says, for example, that referrals cover "not only a doctor's recommendation of a provider, but also a doctor's *authorization* of care by a particular provider."[14] But those references to referring physicians establish a floor rather than a ceiling. *Cooper* does not say that *only* doctors can be referring parties. Neither does the statutory text. And as we have explained, *Miles*, in dicta, said just the opposite.

The Strouds nonetheless read *Cooper* to suggest that a "referral" of a patient means the patient must be directly involved in making a "choice of provider," so that selling a prescription cannot constitute a referral.[15] As the Strouds see it, the Medicare beneficiaries "[were] not advised of the particular DME [supplier who was to fill their order] or urged to choose that particular [supplier]." But the jury also heard testimony wherein witnesses described sending prescriptions to the DME Suppliers to be filled and sent

---

[13] 194 F.3d at 864–65.

[14] 38 F.4th at 433 (quoting *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)).

[15] *See id.* (quoting *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 749 (7th Cir. 2020)).

No. 22-11208

to patients as referrals of those patients to the DME Suppliers. These statements were supported by Silva's testimony that, after it was determined which of the DME Suppliers would fill the doctor's order, U.S. Care typically contacted the beneficiaries "and let them know that the [prescribed DME] products that the doctor signed on were going to be shipped by the [named] DME company." As we evaluate the sufficiency of the evidence, the jury could reasonably have found that individual patients were referred by TrueAlliance and U.S. Care to the DME suppliers at the inducement of the defendants.

Bobbi argues next that the evidence was insufficient to support her conviction for conspiracy to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)–(2).

"A conspiracy to violate the [AKS] under 18 U.S.C. § 371 requires 'an agreement to [violate the AKS], knowing and voluntary participation in the conspiracy, and an overt act by one member in furtherance of the unlawful goal.'"[16] Bobbi's challenge to her conspiracy conviction on appeal is limited to claiming that a rational jury could not have found that she knowingly and voluntarily joined a conspiracy intent on defrauding the United States or violating the AKS.

The jury heard extensive evidence against Bobbi. The jury saw the invoices, spreadsheets, and emails between the defendants and Novack, Silva, and Aaronson carrying out their fraudulent scheme. Silva testified that he proposed the kickback scheme to the defendants during their initial meetings. But Bobbi testified at trial essentially that she acted in good faith

---

[16] *United States v. Gevorgyan*, 886 F.3d 450, 454 (5th Cir. 2018) (quoting *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017)).

with no awareness of a conspiracy to defraud the government or pay kickbacks. The jury was entitled to reject her testimony in the light of the rest of the evidence, and chose not to believe her. The evidence was more than sufficient to convict Bobbi on count one.

Bobbi argues alternatively that her conspiracy conviction should be reversed because the court allowed Novack and Silva to testify at trial that they "conspired with" her, *inter alios*. In particular, Bobbi claims the use of the phrase "conspired with" amounted to those witnesses offering an impermissible legal conclusion to the jury.

This objection is new on appeal, so we review the district court's admission of this evidence for plain error.[17] "Plain error requires that there be (1) error; (2) that is plain, which 'at a minimum,' means 'the error is clear under current law,' and (3) that affects the substantial rights of the defendant."[18] An error affects the defendant's substantial rights, which the defendant has the burden of showing on appeal, when it "affect[s] the outcome of the proceedings."[19]

The testimony Bobbi complains of was made by Novack and Silva at the outset of their examinations. Novack first confirmed that he had already pled guilty to conspiracy to commit healthcare fraud. When asked "who were some of the people [he] conspired with," Novack answered: "Well, there [were] dozens of them, sir." He continued: "They were all in -- in the durable medical equipment space, and I could name a few names, if that is what you would like[.]" When asked if he knew any of his coconspirators, Novack

---

[17] *See United States v. Coffman*, 969 F.3d 186, 189 (5th Cir. 2020).

[18] *United States v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

[19] *Id.*

named Bruce and Bobbi.[20] He also repeated "there were dozens of other companies and individuals that [he] did business with." Silva offered similar testimony.

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."[21] That rule, however, does not necessarily permit witness opinions amounting to legal conclusions.[22] We have recognized that "the line between an impermissible legal conclusion and 'explanation of a [witness's] analysis of facts' is somewhat blurry."[23]

Even assuming Novack and Silva's statements should have been excluded, we think their effect on the outcome of the proceedings has not been sufficiently shown. As described above, the jury rejected Bobbi's good-faith defense because of the other evidence tending to demonstrate that she fully participated in the scheme. We do not find the impeachment now presented for our consideration (for example, inconsistencies with other testimony) sufficiently persuasive to warrant intruding on the jury's purview to reweigh the evidence. And we note that the challenged testimony was heard in the context of other statements indicating that Bobbi was among the "companies and individuals that" Novack "did business with." Accordingly, we cannot say that the effect of this testimony on the jury has been sufficiently demonstrated on appeal to persuade us to disturb the verdict.

_____

[20] He also identified Kenric Griffin, the other named defendant.

[21] Fed. R. Evid. 704(a).

[22] *See United States v. McGee*, 821 F.3d 644, 649 (5th Cir. 2016).

[23] *United States v. Keys*, 747 F. App'x 198, 209 (5th Cir. 2018) (alteration in original).

No. 22-11208

Bobbi similarly urges that Silva testified to the Strouds' knowing violation of the AKS, and that Doug Wood, a witness who had served on a Medicare fraud task force in the Office of the Texas Attorney General, "rendered his conclusion that paying for doctors' orders was a violation of the AKS, and that the Defendants were making 'kickback' payments to secure doctors' orders." Again, in view of the other evidence we have described, we do not think it has been sufficiently shown that this testimony affected the outcome of the proceedings.

## B.    Restitution Order

Finally, Bruce contends for the first time on appeal that the district court's restitution order should be vacated because it was issued in violation of the Fifth and Sixth Amendments. More particularly, he argues that "the amount of restitution imposed must be found by the jury," not the judge. This claim is foreclosed by our longstanding precedent.[24] Bruce acknowledged that his claim is foreclosed by this Court's precedent and explained he raised it to preserve the issue for possible review by this Court.

## III.    CONCLUSION

For these reasons, we find no error and AFFIRM the judgment of the district court.

---

[24] *See, e.g.*, *United States v. Caudillo*, 110 F.4th 808, 810–11 (5th Cir. 2024); *United States v. Petras*, 879 F.3d 155, 169 (5th Cir. 2018); *United States v. Rosbottom*, 763 F.3d 408, 419–20 (5th Cir. 2014).